UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA JESSEN,

               Plaintiff,

                                        Case No. 09-12280

v.                                  Honorable David M. Lawson

CIGNA GROUP INSURANCE and LIFE
INSURANCE COMPANY OF NORTH
AMERICA,

               Defendants.

_____/

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO REVERSE ADMINISTRATIVE DENIAL OF INSURANCE BENEFITS AND DENYING DEFENDANT'S MOTION TO AFFIRM ADMINISTRATOR'S DECISION

Kurt Jessen, a forty-four-year-old manager working for Hewlett Packard, died from a heroin overdose while on assignment for his employer in Melbourne, Australia. Hewlett Packard provided its employees with a life insurance policy underwritten by defendant Life Insurance Company of North America that paid benefits to a designated beneficiary in the event the employee dies as a result of an accident. Because the insurance policy was issued as part of an employee welfare benefit plan, it is governed by the Employee Retirement Income Security Act of 1974 (ERISA). *See* 29 U.S.C. § 1002(1)(A). Jessen's beneficiary was plaintiff Lisa Jessen, Kurt's wife of four months at the time of his death. She applied for the death benefit, which the defendant denied on the ground that Kurt's death was not an accident. After a round of administrative appeals, this lawsuit followed. The parties filed cross motions on the administrative record and the Court heard oral argument on April 19, 2010. The parties agree that the *de novo* standard of review applies. The administrative record is bereft of any evidence that Kurt Jessen intended to injure himself or that his death would result from his illicit drug use. Although Jessen's use of illicit drugs certainly amounts to risky

behavior, there is no basis in the record to conclude that his death resulted from anything but an accident, and the evidence does not invoke any of the policy's exclusions. The defendant's denial of benefits violated the plan's language, and therefore the Court will grant the plaintiff's motion to reverse the plan administrator's decision and deny the defendant's motion to affirm it.

I.

Jessen's group life insurance policy procured by Hewlett Packard contained the following terms:

> In exchange for the payment of premiums . . . , we agree to pay benefits to all eligible persons (as defined in Schedule I):
> a) who suffer injury to the body in any of the types of accidents described in Schedule IV, which happens while he is covered by this policy; and
> b) who, as a direct result of the injuries, and from no other cause, suffered a covered loss (as defined in Description of Coverage).

AR 546. The benefits for loss of life are classified as "Coverage A" and are payable if "a) a person is injured by one of the types of accidents described in Schedule IV which happens while he is covered by this policy; and b) he suffers one of the losses listed below as a direct result of the injuries, and from no other cause, within a year of the accident." AR 554. Schedule IV includes "any accident which occurs anywhere in the world while a covered person, on a business trip, is traveling or making a short stay: a) away from [the employer's] premises in his city of permanent assignment; and b) on business for [the employer], and in the course of [the employer's] business. All such trips must be authorized by [the employer.]" AR 557.

The parties agree that Jessen died while he was in Australia on a business trip for Hewlett Packard, and that the cause of death was a heroin overdose. Whether he died as a result of an "accident" is one point of contention in the case. In a footnote in its response brief, the defendant also maintains that Jessen took the drugs with the intention to overdose. The insurance policy

-2-

excludes from coverage "benefits for loss caused by or resulting from . . . [s]uicide, attempted suicide, or whenever a covered person injures himself on purpose, while sane or insane." AR 555. However, the defendant did not cite that provision of the policy to support its denial of benefits at the administrative level. The policy also contains an exclusion of coverage for self-inflicted injuries, upon which the defendant relies; but the defendant did not cite that provision as a basis for denying benefits, either.

The parties also agree that the applicable plan language does not call for any level of deference to the plan administrator's decision, and that the applicable standard of review is *de novo*.

The facts of the case as disclosed by the administrative record are as follows. Kurt Jessen was employed as an operations manager for Hewlett Packard. He frequently traveled internationally and arrived in Melbourne on business on Saturday, April 26, 2008, to attend a business conference. He was scheduled to return to the United States within a week. When he was late for a business meeting on April 29, his colleague contacted the hotel where he was staying. The hotel's duty manager and security officer went up to Jessen's room, where they found him lying on the bathroom floor in a supine position, with his left sleeve rolled up, a "recent ven[i]puncture" on his left inner elbow, and a small amount of vomit "from airway and down side of face." AR 464, 487, 518. On the bathroom counter top, the hotel employees found drug paraphernalia consisting of a small Sharps container, two syringes, some alcohol swabs, and a used plastic spoon. Also found in the hotel room were pills of Suboxone (medical substance used to treat an opiate addiction), Chantix (smoking cessation treatment), Imodium, and Tylenol.

According to the Inquest Brief of the Victoria police department prepared by Detective Leading Senior Constable Adrian Smith, the reason of Jessen's death was "[a]ccidental illicit drug

overdose (heroin)." AR 452. Testing confirmed that Jessen had 0.2 mg/L of morphine in his blood, 3.7 mg/L of morphine in his urine (which usually indicates the use of heroin within six hours of death), and 0.03 mg/L of codeine in his blood. The autopsy report explained that "[m]orphine is the principal metabolite of heroin" and that "[c]odeine is often found as an impurity in heroin." AR 52, 58. The autopsy revealed no evidence of significant natural disease and no signs of injury, but confirmed pulmonary edema, which also commonly occurs with overdose deaths.

There is little dispute that Jessen had a long history of drug dependence. His mother recalled that Jessen "began to experiment with drugs . . . between 1990-1991, perhaps earlier," had been admitted "in several inpatient short term and long term rehabilitation facilities," and managed to be "drug free sporadically, for periods of from one to three years." AR 65. One of Jessen's most recent relapses occurred when he resided in Melbourne in 2006-2007. His mother believed that he "befriended a woman [who] . . . provided Kurt with drugs in exchange for a place to live." AR 66. There is also testimony on the record that during his stay in Australia in 2006-07, Jessen, who at the time was separated from his second wife, dated one Sheila Margaret Scott. AR 508, 504. Scott recalls that Jessen got her hooked on heroin and tried to introduce her to other illicit drugs. *See* AR 509-10.

This relapse prompted both Jessen and Scott to enroll in the outpatient rapid detox program with Dr. Yona Josefsberg, where both were placed on the Suboxone program. Although Jessen's mother reports that Jessen had a brief, two- or three-day relapse during the course of the program, she insists that Jessen was drug-free following his return from Australia in August 2007.

Following his return from Australia in August 2007, Jessen met his third wife, Lisa M. Jessen, the plaintiff in the present case. After a month of dating, Jessen proposed, and the couple

-4-

married on December 31, 2007. Jessen had two daughters from previous relationships; the plaintiff

also had a daughter from a previous marriage. Jessen's mother claims that the plaintiff was Jessen's

"soulmate" and "the love of [his] life." AR 504. The plaintiff likewise recalls having a solid, loving

relationship with Jessen; she also notes that Jessen treated her daughter Amanda as his own.

The plaintiff remembers that when Jessen was traveling, as he would frequently do for his

work, he would contact her regularly during set times each day. The plaintiff recalls her last

conversations with Jessen during his final trip to Melbourne:

> 4. Kurt left for Melbourne, Australia on April 20, 2008.
>
> 5. On April 24, 2008, Kurt called me in the air as he was leaving Germany on his way to Singapore. During this conversation, we discussed this trip being his last for a while so we could spend time together in our new married life. Kurt had already traveled two months out of the four months we had been married.
>
> 6. He called me on April 25, 2008 to tell me he was leaving Singapore for Australia.
>
> 7. He called me about 12:42 p.m. on April 26, 2008 as soon as his plane landed and got situated with his car and baggage. He told me he couldn't wait to come back home, that he missed me and my daughter and was sorry to be missing my birthday. He promised to get me an opal charm for my chain.
>
> 8. My mother called me on Sunday, April 27, 2008 to take me to lunch. Kurt called while I was at lunch and I told him I was with my mother and would call him after lunch. He didn't want to wait and wanted to talk to him at that moment. He became upset and short with me because I wouldn't talk to him. He had never acted this way with me before and was completely out of the ordinary for him. He kept calling me and I did not answer. I did call him after lunch and we argued about the earlier calls. He felt bad that he had missed Valentine's Day, Amanda's birthday and would be missing my birthday because of this trip.
>
> 9. My mother told me later that day that Kurt called her earlier to thank her for taking me to lunch and apologized for not being there for me. He told my mother how much he loved me.
>
> 10. Later that night, I spoke with Kurt. We discussed the earlier conversation and both apologized. He told me how much he missed me and couldn't wait to get home. He seemed his normal self again.
>
> 11. He promised to call me first thing in the morning as usual on April 28, 2008. I never heard from him after the last time we spoke shortly before midnight, April 27, 2008.

Lisa Jessen aff., AR 498-99.

The plaintiff averred that she heard from Jessen's colleague, Bob Huffman, who accompanied Jessen on the Australia trip. Huffman reported that on April 27, 2008 Jessen appeared to be extremely tired, disoriented and "had dropped his entire face into a bowl of soup at dinner." AR 500. However, Huffman said that he and Jessen planned activities with their families together after they returned from Australia.

The hotel records show that around 5 p.m. on April 28, 2008, Jessen placed a call to a cell number that is believed to belong to a drug supplier. He left the hotel at 5:26 p.m. and returned at 6:34 p.m. The hotel's video surveillance depicts him wearing the same clothing that he wore when he was found dead the following morning. No one else entered Jessen's room that night. When next morning Jessen did not call his wife as promised and did not appear for his business meeting, his colleague contacted the hotel, which began the process leading to the discovery of Jessen's body.

The plaintiff timely applied for the benefits under the policy on May 14, 2008. The claim was evaluated by defendant Life Insurance Company of North America, which is a subsidiary of underwriter CIGNA Corporation. On August 5, 2008, CIGNA Group Insurance Accident Specialist Mary Schwarz informed plaintiff's counsel at the time that the benefits would not be payable because Jessen's death was not a result of the accident. AR 120-24. Schwarz wrote:

> Information in the claim file supports that Kurt T. Jessen died of mixed drug toxicity on 4/29/2008 while he was traveling on business for Hewlett Packard.
> Policy ABL 960190 states that it is an "accident only policy" and pays benefits for a loss resulting from an accident.
> The information provided to us by you, John T. Panourgias, reveals that Kurt T. Jessen had a history of drug abuse and that he had attended a drug rehabilitation program in his past.
> Although Kurt T. Jessen is said to have been "clean" when he married Lisa Jessen in December 2007, it appears that he did abuse illicit drugs while he was traveling on business in Melbourne, Australia.
> . . .

-6-

Given the evidence of the recent venepuncture mark on his arm with his sleeve rolled up and syringes and alcohol swabs in his vicinity, it appears that Kurt T. Jessen intentionally injected morphine into his body. Having attended a drug rehabilitation program in the past, Kurt T. Jessen would have been aware that illicit drug use could produce a possible negative outcome. Additionally, Kurt T. Jessen was a manager with Hewlett Packard, as indicated on the claim form, and thus would be assumed to be sufficiently educated and intelligent to perform the duties of that occupation. A person of such education and intelligence cannot be unaware of the possible negative outcomes of illicit drug use.

Policy ABL 960190 only pays benefits for loss resulting from an accident. As Kurt T. Jessen cannot have been unaware of the potential for a possible negative outcome from using illicit drugs, his death would not be considered an accident for the purposes of this policy. For this reason, no benefits are payable to your client under policy ABL 960190.

AR 122-23.

The plaintiff appealed this initial denial of benefits. In the course of her appeal, the plaintiff engaged Dr. Michael Boyle III, D.O., the Medical Director for Maplegrove Center, part of the Henry Ford Health System in the Metropolitan Detroit area, board-certified in internal and addiction medicine, to opine on the cause of Jessen's death. Boyle concluded, after reviewing materials in the case, that Jessen died of accidental, and not an intentional, overdose. He wrote:

It is my opinion that Mr. Jessen died of an accidental overdose of an intravenous narcotic, most probably heroin. The toxicology report suggests that as does the autopsy showing congestion (pulmonary edema) of the lungs. There was also one recent needle injection site on the left antecubital fossa.

Mr. Jessen had a history of narcotic addiction over the years and had had periods of time in his life of abstinence. There also was a drug found at the scene called Suboxone which is used to help heroin addicts abstain by reducing cravings.

I believe that Mr. Jessen was drug free for a significant period of time prior to his death because only one recent venipuncture was found on his arm and the statements by his wife do not support that he had been using drugs.

I believe that the compulsion to use heroin returned on or around April 27, 2008 and that Mr. Jessen was unable to cope with the compulsion. He subsequently was able to secure and inject an amount of heroin that took his life. Because he was drug free for a significant period of time, his prior tolerance had returned to a lower level and the amount he thought he had tolerated before was not able to be tolerated because of this lower tolerance.

-7-

> I believe he was not trying to injure himself but only trying to obtain the euphoric effect of the drug.  This scenario I have seen numerous times in my years of practice.  It is an unfortunate and unintended consequence of addiction.

AR 576-77.

Nonetheless, on February 23, 2009, CIGNA's Life and Accident Claim Services Specialist Renee Worst issued a final letter upholding denial of benefits.  After setting forth the reviewed evidence, she concluded:

> This policy . . . is a Business Travel Accident Policy which pays benefits for losses incurred only from accidental injuries within the specifications outlined above.  Having reviewed the available record, indications are that Mr. Jessen had a history of drug abuse and rehabilitation treatments.  The information submitted with the claim supports the fact that Kurt Jessen did abuse illicit drugs while on business in Melbourne, Australia.  This illegal drug use ultimately resulted in his death.
> Policy ABL 960190, as quoted previously, is an Accident Policy which pays benefits for losses incurred only from accidental injuries within the specifications outlined above.  Based on the fact that Mr. Jessen had a history of intravenous drug use and rehabilitation programs it is extremely unlikely that he was unaware of the risks associated with his behavior.  As mentioned previously, policy ABL 960190 only pays benefits for loss resulting from an accident.  Therefore, injury or death resulting from his intravenous drug use is considered foreseeable and not accidental and not covered by the provisions of policy ABL 960190.

AR 3-4.

In the meantime, the plaintiff applied for benefits under her husband's Accidental Death and Dismemberment policy issued to Hewlett Packard by Prudential Financial.  The terms of the Prudential policy were substantially similar to the terms of the CIGNA policy and required that the loss be attributable to a "[c]overed [a]ccident," Prudential paid without incident.  Pl.'s Mot. for Sum. J., Ex. 22, at 34, 37.  Like CIGNA's policy, the Prudential policy contained an exclusion for losses resulting from suicide or attempted suicide or from intentionally self-inflicted injuries.  Prudential paid the full $300,000 payout without objection.  The death benefit in this case is computed as a

-8-

multiple of the insured's earnings. The parties agree that if coverage obtains, that amount equals $480,000 in Jessen's case.

The plaintiff filed the present action on June 12, 2009 under section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Thereafter, the parties filed their cross motions on the administrative record.

## II.

The general rule in cases challenging the denial of employee benefits under ERISA section 502(a)(1)(B) is that the district court reviews the plan administrator's decision *de novo*, unless the plan gives the administrator discretionary authority to determine participants' eligibility for benefits, in which case the court must apply the highly deferential arbitrary and capricious standard of review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009). Whether a benefits plan grants discretionary authority is determined by reference to the plan's specific language. Although the use of certain terminology is not necessary to vest discretion and thereby trigger the arbitrary and capricious standard, the plan nonetheless must contain "a clear grant of discretion [to the administrator] to determine benefits or interpret the plan." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 (6th Cir. 1998) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994)). The parties agree that no such language is found in the plan or the insurance policy.

The *de novo* standard requires the reviewing Court to "determine whether the administrator made a correct decision." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th

Cir. 2002) (internal quotation marks and citation omitted).  Review is confined to the evidence in the administrative record.  *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998).  "[T]he administrator's decision is accorded no deference or presumption of correctness." *Hoover*, 290 F.3d at 809.  Based on the record before the plan administrator, "the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan."  *Ibid.*

A.

The plaintiff argues that California law applies to that determination because of a policy provision that states that "[t]his policy shall be  governed by the laws of the state in which it is delivered."  AR 546.  The plaintiff argues that the group policy was purchased by Hewlett Packard at its corporate office in California, and therefore it was "delivered" there.  In making that argument, the plaintiff seeks to avail herself of an insured-friendly definition of the term "accident," under which a death or injury will be covered "even if caused by the insured's voluntary act[,] . . . *unless the insured virtually intended* his injury or death."  *Smith v. Stonebridge Life Ins. Co.*, 582 F. Supp. 2d 1209, 1216 (N.D. Cal. 2008).  The defendant counters that the group insurance policy was delivered in Pennsylvania, where it signed the policy at its principal place of business.  But despite that feature, the defendant insists that federal common law that has developed under ERISA is the governing law in this case.

"In determining which state's law applies in an ERISA case, this court's 'analysis is governed by the choice of law principles derived from federal common law.'" *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006) (quoting *Medical Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001)).  Under those rules, choice-of-law provisions

-10-

in an ERISA plan that prefer one state's laws over another generally will be honored, unless an overriding policy consideration requires a different choice. *Ibid.* (citing Restatement (Second) of Conflict of Laws § 187 (1971)). "Enforcing choice of law provisions in ERISA plans takes the object of uniformity one step further by ensuring that all issues not preempted by federal law will be resolved by application of the chosen state's law. In general, this too will add certainty to the claim administration process leading to more efficiency and less litigation." *Id* at 928.

However, ERISA generally "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). ERISA's preemption provision is "deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Stevens v. Employer-Teamsters Joint Council No. 84 Pension Fund*, 979 F.2d 444, 454 (6th Cir. 1992) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45-46 (1987) (internal quotation marks and citation omitted)). Where ERISA does not address an area of benefit entitlement, and the plan does not contain relevant provisions, "federal common law is expected to develop and address rights and obligations arising under the Act." *Auto Owners Ins. Co. v. Thorn Apple Valley, Inc.*, 31 F.3d 371, 374-75 (6th Cir. 1994) (citing *Pilot Life Ins. Co.*, 481 U.S. at 56); *see also Thomas v. Miller*, 489 F.3d 293, 297 (6th Cir. 2007) (stating that "ERISA authorizes the courts 'to fashion a body of federal common law to enforce the agreement[s] that these statutes bring within their jurisdiction'" (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298-1300 (6th Cir. 1991))).

In *Medical Mutual of Ohio v. K. Amalia Enterprises, Inc.*, 548 F.3d 383 (6th Cir. 2008), the Sixth Circuit disregarded a choice-of-law provision in an insurance contract because the provision did not address the interaction between state and federal law. The court explained:

-11-

The presence in the parties' contract of a choice-of-law provision stating that the contract will be governed by "the laws of the state of Ohio" does not change [the rule that ERISA benefits claims under 29 U.S.C. § 1331(a)(3) are interpreted using federal common law]. As we have observed elsewhere, "'the normal purpose of such choice of law clauses is to determine that the law of one state rather than that of another state will be applicable; they simply do not speak to any interaction between state and federal law.'" *Ferro Corp. v. Garrison Indus., Inc.*, 142 F.3d 926, 938 (6th Cir. 1998) (quoting *Volt Info. Sciences, Inc. v. Bd. of Trustees*, 489 U.S. 468, 488 (1989) (Brennan, J., dissenting)).

*Id.* at 391.

Such is the case here. The statement on the front page of the policy that the "policy shall be governed by the laws of the state in which it is delivered" does not alter the default rule that in evaluating questions of policy interpretation under ERISA, federal courts must develop and apply a body of substantive federal common law. The language in the policy does not resolve a conflict between state and federal law. Nor can it be read properly to prefer the law of a particular state over federal common law. The core dispute in this case revolves around the meaning of the term "accident" within the group policy. The term is not defined in the policy. "[W]here the crucial terms of an accident policy are defined with surpassing vagueness, . . . to deploy the federal common law of ERISA to give some unity to the concept of 'accident' is sound judicial policy." *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1146-47 (11th Cir. 2001). Therefore, federal common law must provide the rules for decision in this case.

### B.

The defendant argues that it was correct in its decision to deny payment of the death benefit because the decedent's death was not caused by a loss included as a "covered peril" in the grant of coverage, and two policy exclusions prohibit the payment of benefits. For reasons stated below, the

-12-

Court believes that the defendant did not interpret the plan language properly and improperly failed to pay the plaintiff the benefits to which she is entitled.

1.

The plaintiff contends that Kurt Jessen died as a result of an "accident . . . while . . . on a business trip" in Australia for Hewlett Packard.  The defendant's main contention is that because Jessen voluntarily injected himself with heroin, which caused his death, his death cannot be considered an accident.

The facts of the case are not much in dispute.  It is quite clear that Jessen had suffered from drug addiction in the past, had used heroin on multiple occasions, and had sought treatment for his addiction.  His family believed (mistakenly, as it turns out) that he had conquered his addiction by the time he left town for his business trip.  Two more things are apparent: Jessen voluntarily injected himself with heroin, and his death was caused by an overdose of the drug or from a complication of using the drug.  Finally, there is no direct evidence that Jessen took the drug with the intention to kill or injury himself.

In light of these facts, the question of coverage initially turns on the definition of "accident" as that term is used in the policy.  The policy contains no definition of the term, and there is no exclusion of coverage for the specific activity involved here, that is, the use of non-prescribed, illegal drugs that causes or contributes to death or injury.

Two decisions from the Sixth Circuit most recently have discussed the construction of the term "accident" by ERISA plan administrators when death or injury occurs following the voluntary ingestion of foreign substances.  The first case, *Lennon v. Metropolitan Life Insurance Co.*, 504 F.3d 617 (6th Cir. 2007), does not provide much guidance because the court deferred to the plan

-13-

administrator's construction of the term under an arbitrary-and-capricious standard of review. The court upheld the denial of life insurance benefits to a plan beneficiary where the decedent had ingested alcohol and had a blood alcohol content of 0.321% by weight, drove his vehicle the wrong way down a one-way street at high speed, and crashed the car into a wall, killing himself. The plan administrator determined that the decedent's death was not an "accident," because his conduct rendered the risk of injury or death "reasonably foreseeable." The court found that the plan administrator's equating reckless conduct with intentional conduct was not arbitrary or capricious and therefore upheld the decision denying benefits.

The case generated three opinions. In addition to the lead opinion, one judge dissented and another concurred. The lead opinion acknowledged that the court was not attempting to define the term "accident" as used in such insurance policies, explaining:

> Of course, "accidental" could perhaps be more broadly defined to include dangerous activity as long as injury is not intended or substantially certain. Drunk driving injuries might fit within such a definition. If our review were de novo, this possibility would require serious consideration. FN6
> . . .
> But under arbitrary-and-capricious review we need not decide what is the best reading of words in the insurance policy, but whether the plan administrator's interpretation is arbitrary. Interpreting the result of reckless drunk driving as not "accidental" for the driver is not arbitrary.

_____

FN6. The concurrence unfortunately misreads this opinion as "address[ing] the question whether it was correct, as a matter of substantive law, for MetLife to deny benefits here, rather than the question whether or not it was merely arbitrary and capricious to do so." As a fair reading of this opinion — and particularly of the statement here in the text — shows, I would base affirmation entirely on the arbitrary-and-capricious scope of review, and reserve judgment on the correctness (without regard to deference) of treating the incident as an accident under the policy.

Moreover, while the concurrence would rely only on other federal court cases, which in turn rely simply on likelihood of harm, to uphold the insurance company's determination under the arbitrary-and-capricious standard, such reliance without

> more implies that high likelihood of injury is sufficient to uphold denial of accident
> insurance whenever the arbitrary-and-capricious standard applies. The instant
> opinion is intended to avoid making that implication in favor of the insurance
> companies. There may be cases — different from the instant case — in which high
> likelihood of injury is not sufficient to say that activity was not accidental. We need
> not go beyond reckless conduct to conduct that is simply "highly likely" to cause
> injury, and I would not do so.

*Id*. at 623-24 & n.6.

The second Sixth Circuit case did offer a definition of the term "accident" as used in employer-provided insurance policies reviewed under ERISA. The case, *Kovach v. Zurich American Insurance Co.*, 587 F.3d 323 (6th Cir. 2009), also concerned the denial of benefits to a plan beneficiary injured in a drunk driving accident. (The injured person had a blood alcohol content of 0.148%, tested positive for opiates and benzodiazepines, and ultimatelt lost his leg in the motorcycle-automobile accident after running a stop sign.) The court applied the arbitrary-and-capricious standard of review and reversed, rejecting the plan administrator's reasoning that injuries resulting from drunken driving are reasonably foreseeable and therefore not "accidental." In reaching that conclusion, the court established a few principles that furnish guidance when interpreting accidental death and injury insurance policies under ERISA. First, the court reiterated the statutory command that "ERISA . . . benefit plans must be 'written in a manner calculated to be understood by the average plan participant.'" *Id.* at 332 (quoting 29 U.S.C. § 1022(a)). From that premise, the court determined that when defining the term "accidental," "'the administrator must adhere to the plain meaning of its language as it would be construed by an ordinary person.'" *Ibid.* (quoting *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004)). As its source for such a definition, the court turned to Webster's dictionary, which defines "accidental" as:

> 2a: occurring unexpectedly or by chance b: happening without intent or through
> carelessness and often with unfortunate results

*Id.* at 333.

Next the court held that categorically excluding injuries that result from engaging in risky behavior because they are reasonably foreseeable is "arbitrary and capricious in light of the typical policyholder's expectations" because that practice "would bar accidental injury coverage in numerous situations in which the typical policyholder would expect to be covered." *Id.* at 335-36.

Finally, the court determined that "the time [was] ripe for this court to adopt a uniform standard for determining whether an injury is 'accidental' in ERISA cases where the word is not otherwise defined in the applicable policy." *Id.* at 336-37.  The court chose the rule established in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990).  *Id.* at 337.

This Court has discussed and applied the *Wickman* rule in a previous case involving an accident resulting from the voluntary ingestion of substances.  *See Harrell v. Metro. Life Ins. Co.*, 401 F. Supp. 2d 802 (E.D. Mich. 2005).  The rule requires a two-stage inquiry, consisting of a subjective and an objective component.  If the insured subjectively intended to cause himself injury or death when engaging in a voluntary act, then there is no "accident" under the ordinary meaning of that term.  But in cases where the insured intended the act but "did not intend the harm that befell him, 'the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable.'"  *Id.* at 812 (quoting *Wickman*, 908 F.2d at 1088).  As the *Kovach* Court explained, that inquiry requires the court to ask "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct."  *Kovach*, 587 F.3d at 337 (quoting *Wickman*, 908 F.2d at 1088).  The *Kovach* Court quantified the *Wickman* rationale, declaring that "highly likely" must

-16-

mean more than a 50% possibility; instead, "one might contemplate a 75% or higher probability before the average person would be persuaded that a collision was 'highly likely' to occur." *Ibid.*

Applying those principles to the facts in this case leads to the conclusion that Jessen's death was "accidental" within the plain meaning of the insurance policy. The defendant offers a token challenge to coverage based on the decedent's subjective intent in a footnote in its brief arguing that Jessen took the drugs with an intention to overdose. The evidence does not bear such an assertion, but rather establishes the contrary conclusion. As Dr. Michael Boyle's report explains and the autopsy and police reports corroborate, Jessen "was not trying to injure himself but only trying to obtain the euphoric effect of the drug." AR 577. The similar conclusions of the Australian police and autopsy examiner on the cause of Jessen's death resulted from thorough and methodical investigations. The detectives were physically present and acquired first-hand knowledge of the circumstances of Jessen's death. Consequently, those opinions are entitled to significant weight. *See Smakula v. Weinberger*, 572 F.2d 127, 132 (3d Cir. 1978) (noting that "the medical ascription of cause of death, be it on a death certificate, an autopsy report or a report of an examining physician, may be conclusive, if reliable"). Although there is a hearsay report of a co-worker that Jessen acted bizarrely on the day he died, there is nothing in the record supporting the defendant's hypothesis of an intentional overdose. Moreover, there are multiple accounts of the plans that Jessen made for his return to the United States, including the gifts he would bring for his wife and the trip that he and his family would take. Jessen also changed his ticket to return one day earlier than originally scheduled. There is no direct evidence of Jessen's subjective intent to kill or injure himself, and the circumstantial evidence persuasively establishes the absence of such intent.

-17-

That leaves the question whether a reasonable person with Jessen's background and experience would have concluded that Jessen's voluntary use of heroin on April 29, 2008 was highly likely to cause death or serious injury. That question must be answered in the negative as well.

Absent from the record is any information on the likelihood of death following heroin injection in the general population. However, Jessen's own survival for a period of almost twenty years of intermittent heroin use is a testament that the use of the drug does not inevitably lead to death. A report from the Center for Disease Control and Prevention of the U.S. Department of Health and Human Services states that in 2007, the number of deaths involving, legal opioid analgesics, which include prescription drug pain killers such as oxycodone, hydrocodone, and methadone, was 1.93 times the number involving cocaine and 5.38 times the number involving heroin. *See* Unintentional Drug Poisoning in the United States, 2010 CDC Report, *available at* http://www.cdc.gov/HomeandRecreationalSafety/pdf/poison-issue-brief.pdf. In absolute numbers, about two thousand drug overdose deaths in 2007 were due to heroin use, compared to about 6,000 deaths attributable to cocaine use and over 11,000 deaths attributable to opioid analgesic. *Ibid.* One study comparing causes of unintentional poisoning deaths in eleven states over a eleven-year period ranked deaths due to alcohol poisoning (8%) as comparable to deaths by heroin overdose (7%). *See* Center for Disease Control, Unintentional and Undetermined Poisoning Deaths — 11 States, 1990-2001, *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5311a2.htm. Even if information was offered into the record dealing with the relative risk of death due to the over-use of foreign substances, there does not appear to be much reason to treat heroin users categorically different from alcohol users when construing the terms of the accidental death insurance policy. In all events, the record does not support the transition of death as a consequence of heroin use into the

-18-

realm of likelihood.  The possibility of death certainly is less likely to result from use of heroin by an experienced user when compared to, say, the over use of alcohol *and* prescription drugs immediately before riding a motorcycle.

Also, when examining the objective reasonableness of the unlikeliness of harm in light of the "background and characteristics [of a person] similar to the insured," *Kovach*, 587 F.3d at 337, the Court must consider the amount of the drug taken by Jessen.  The evidence supports the conclusion that Jessen overdosed on heroin because of his diminished tolerance in the aftermath of extended heroin abstinence.  Dr. Boyle's report sheds some light on the concept of tolerance.  Boyle explains: "Because [Jessen] was drug free for a significant period of time, his prior tolerance had returned to a lower level and the amount he thought he had tolerated before was not able to be tolerated because of this lower tolerance."  AR 577.  The autopsy report confirms that diminished tolerance may result in an overdose:

> In an intravenous heroin addict, it is important to appreciate the concept of tolerance.  This is a phenomenon whereby increasing doses of heroin are required to achieve the same effects.  Levels of tolerance can develop within days and after abstinence from heroin it can take days and possibly weeks to diminish.  Disappearance of tolerance has nothing to do with a remaining craving or desire for the drug.  A drug addict unaware of the concept of tolerance may inadvertently overdose by injecting the same dose he/she used prior to a period of abstinence.

AR 58.

Jessen's mother's and wife's testified that Jessen had not used drugs for some extended time prior to his alleged overdose.  There were Suboxone pills in Jessen's room, which suggests that Jessen had been trying actively to combat his drug addiction.  This record supports an inference that while Jessen intended to administer heroin, he did not intend to administer a *fatal* dose of the substance, and it was not objectively unreasonable of him to expect to simply get high — yet stay

-19-

alive — as a result of consuming the dosage.  Under *Wickman*, Jessen's death was not highly likely

to occur as a result of his voluntary conduct, and therefore the death must be considered an accident.

*See Sheehan v. Guardian Life Ins. Co.*, 372 F.3d 962, 967 (8th Cir. 2004) (reversing denial of

benefits where the insured was a drug user, but "all of the evidence indicated that [he] accidentally

ingested a lethal dose of morphine"); *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 463 (7th Cir.

1997) (reversing denial of benefits where the insured did not know that the amount of pain reliever

she took would turn out to be lethal).  The Plan administrator's denial of benefits because "Jessen

cannot have been unaware of the potential for a possible negative outcome from using illicit drugs"

rests on the application of the wrong definition of the term "accident," because a "possible negative

outcome" does not square with the requirement that the peril must be "highly likely to occur."

*Kovach*, 587 F.3d at 337.

The defendant attempts to distinguish this case from *Kovach* by emphasizing the lack of

social utility in heroin use compared to the obvious utility of driving motor vehicles.  It is true that

one is hard-pressed to find social utility in injecting heroin, or in many of the other activities that

may be considered risky behavior, such as sky diving, bungee jumping, or NASCAR racing.

However, the defendant's comparison is imperfect.  Rather than equating heroin use with driving,

the defendant must to compare heroin use with alcohol consumption.  Although the latter is legal

and the former is outlawed, neither have much social utility.  And of course, the defendant could

have chosen to cover only accidents resulting from legal activities, which it did not do in favor of

defining coverage based on "accidental" occurrences.  The decedent's death qualifies as an accident,

as that term is commonly understood.

2.

The defendant also argues that recovery is barred by an exclusion of "benefits for loss caused by or resulting . . . whenever a covered person injures himself on purpose, while sane or insane." AR 555.  The defendant reasons that because Jessen's consumption of heroin was voluntary and he must have been aware of the dangers of using heroin, the self-inflicted injury exclusion prevents his widow from recovering.  The defendant places heavy reliance on *Holsinger v. New England Mutual Life Insurance Co.*, 765 F. Supp. 1279 (E.D. Mich. 1991), where the Court articulated a four-part test for determining whether an injury was intentionally self-inflicted.

As an initial matter, the Plan administrator never denied the benefits based on the self-inflicted-injury exclusion.  That argument was first proposed as a justification for the denial by defense counsel during the present litigation.  As this Court observed, there is something unseemly about allowing the counsel to "shore up a decision . . . after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments."  *Harrell*, 401 F. Supp. 2d at 808 (quoting *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 849 n.7 (6th Cir. 2000)).  The tardy argument is not forfeited, but the Court must carefully scrutinize any such *post-hoc* rationalizations, and review them *de novo*, which is the applicable standard of review in this case anyway.  *See University Hospitals of Cleveland*, 202 F.3d at 849 n.7.

In interpreting what falls within a self-inflicted injury exception, the *Kovach* Court adopted the reasoning of the Eighth Circuit in *King v. Hartford Life & Accident Insurance Co.*, 414 F.3d 994 (8th Cir. 2004) that "'the exclusion for injuries contributed to by "intentionally self-inflicted injury . . ." does not include injuries that were unintended by the participant, but which were contributed to by alcohol intoxication.'"  *Kovach*, 587 F.3d at 339 (quoting *King*, 414 F.3d at 1004).  Based on

-21-

that reasoning, the court held that the self-inflicted injury exception did not apply where the insured

"acted intentionally in drinking to excess and then riding his motorcycle" but where he did not do

so "with a mind towards harming himself." *Ibid*. The court explained:

> [The administrator's] interpretation of the exclusion in question conflates
> intentional actions with intentional results. [The insured's] injuries, in other words,
> were the result of the collision, not simply a consequence of his acts of drinking and
> driving. After all, "[o]ne rarely thinks of a drunk driver who arrives home safely as
> an 'injured' party." [*King*, 414 F.3d at 1004. The insured's] intoxication likely
> contributed to the collision, but to define his excessive drinking as a "purposely
> self-inflicted wound" would be an illogical and "startling construction." *Id*. [The
> administrator's] denial of [the plaintiffs'] claim on this basis was therefore arbitrary
> and capricious.

*Kovach*, 587 F.3d at 339.

The *Kovach* holding casts doubt on the validity of the formulation of the self-inflicted-injury

exception suggested by the Court in *Holsinger*. The four-part test used by that Court for determining

whether a drug overdose fell under the self-inflicted-injury exclusion was set forth as follows:

> First, was the ingestion of drugs intentional? Second, did the decedent know
> that the ingestion of drugs would be likely to cause an injury? Third, did the
> ingestion of drugs cause an injury? Fourth, did the loss result from the injury?

*Holsinger*, 765 F. Supp. at 1282.

When applying that test, the *Holsinger* Court lowered the bar further below the prevailing

"highly likely" standard, reasoning: "For example, when the loss is death, it is not necessary that the

person ingesting the drugs know that death could result. If the person ingesting the drugs has a

*general cognizance* that the drugs *could* produce some injury, it is enough that there is some causal

relation between the injury caused and the ultimate loss." *Ibid*. (emphasis added).

As many other courts observed, the *Holsinger* standard cannot be correct. *Andrus v. AIG*

*Life Ins. Co.*, 368 F. Supp. 2d 829, 833-34 (N.D. Ohio 2005); *Gower v. AIG Claim Servs., Inc.*, 501

-22-

F. Supp. 2d 762, 775 (N.D. W. Va. 2007).  Rather than focusing on intentional ingestion of the drug, the inquiry must focus on whether the action is "purposeful towards a goal."  *Andrus*, 368 F. Supp. 2d at 834.  As this Court pointed out in *Harrell*, "it is not reasonable to read the self-inflicted-injury exclusion . . . to include unintended injuries that result from voluntary engaging in risky behavior.  To do so would require reading additional requirements into the plan."  401 F. Supp. 2d at 811.  Although "death can be a foreseeable consequence of overdosing on drugs, . . . many results are the foreseeable consequence of risky actions."  *Andrus*, 368 F. Supp. 2d at 834.  "[I]t is not sufficient merely that a serious risk was willingly undertaken, so long as injury was not intended and, objectively, was not likely to occur."  *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 263 (2d Cir. 2004) (concluding that the provision excluding loss resulting from intentionally self-inflicting injuries does not apply to death from autoerotic asphyxiation).

The conduct at issue does not fall within the self-inflicted-injury exception for much the same reasons that it constitutes an accident.  As discussed earlier, there is no evidence that Jessen intended his death or should have known that death was highly likely to occur as a result of taking the drugs.  *Cf. Minshew v. Fed. Ins. Co.*, 255 F. Supp. 2d 714, 719-20 (E.D. Mich. 2003) (Feikens, J.) (affirming arbitration panel's award of benefits applying Michigan law and concluding that where a heroin user merely intended to "get high," death was not a result of a self-inflicted injury).  The self-inflicted-injury exclusion does not bar recovery.

3.

Finally, the defendant relies in this litigation on the suicide exclusion.  However, for the reasons discussed above, the evidence does not support the idea that Jessen intentionally killed himself.

-23-

III.

The Court concludes that the defendant did not make the correct decision when determining that Kurt Jessen's death was not a covered peril within the meaning of Hewlett Packard's group life insurance policy. Jessen's death was an "accident," according to the accepted meaning of that term under Sixth Circuit law, and none of the policy exclusion to coverage apply. The plaintiff also has requested an award of attorney's fees, which may be appropriate under 29 U.S.C. § 1132(g)(1). However, the defendant contends the request is premature. The Court finds that the defendant has the better argument. The plaintiff may apply for attorney's fees under Federal Rule of Civil Procedure 54(d) and E.D. Mich. LR 54.1.2.

Accordingly, it is **ORDERED** that the plaintiff's motion to reverse the decision of the defendant plan administrator [dkt # 19] is **GRANTED**.

It is further **ORDERED** that the defendant's motion to affirm the decision of the plan administrator [dkt # 22] is **DENIED**.

-24-

It is further **ORDERED** that the matter is remanded to the defendant plan administrator with directions to pay to the plaintiff, Lisa Jessen, the death benefit under the Travel Accidental Death Policy in the amount of $480,000 plus applicable interest.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   June 21, 2011

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 21, 2011.

s/Deborah R. Tofil
DEBORAH R. TOFIL